DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a Washington County Common Pleas Court judgment that (1) overruled a motion for new trial filed by Carlton Oil Corporation, plaintiff below and appellant herein, and (2) let stand a judgment in favor of the East Ohio Gas Company, d/b/a Dominion East Ohio Gas Company, defendant below and appellee herein. The following error is assigned for our review:
 {¶ 2} "The trial court erred in failing to award monetary damages to the plaintiff-appellant after trial to the court and in denying the motion for a new trial of the plaintiff-appellant."
 {¶ 3} A brief summary of the facts pertinent to this appeal is as follows.[1] Appellant is an oil and gas producer. Appellee is a large gas purchasing and distribution company. The parties are both signatories, or successors in interest to signatories, on various "Life of the Well Contracts" entered into from 1981 to 1986 for the sale of natural gas.[2] The parties entered into different contracts over the years, with different pricing provisions, but the contracts were all subsequently amended to provide as follows:
 {¶ 4} "Effective with the first full production period following August 1, 1986, and until further notice, River will purchase gas from new wells turned on and producing new gas into River's lines for the first time after September 1, 1981, and currently receiving in excess of $2.65/MCF at a gas purchase price of the higher of either $2.65/MCF or any new vintage price in excess of $2.65/MCF which it may establish, but not more than the price originally provided in the contracts and letter amendments applicable to this gas."[3]
 {¶ 5} It had long been the practice of appellee's predecessor in interest and other gas purchasers to establish a standard price commencing on a specified date to be paid for gas under "Life of the Well" contracts from wells turned into its lines. This price then applied to all new gas purchases under "Life of the Well" contracts until market conditions forced a change in the price. Each period from the announcement of a new price to the date that the price changed was called a "vintage." Some "vintages" lasted several years; some only a few months.
 {¶ 6} In the early 1980s, an oil and gas boom occurred. Prices and demand were high. The original gas contracts provided for lower payments for new gas which escalated over the first few years of the contracts. Most gas wells have a period of high gas production early in the life of a well. The higher prices that came into effect later in the contracts were intended to enable producers to have enough money to maintain their wells as the wells got older and production waned. Later, in the 1980s, a significant decrease in the price of gas occurred. As the price of gas fell during the 1980s, appellee sought to reduce its costs.
 {¶ 7} By the late 1980s, appellee purchased gas under several different types of contracts — "Fixed Price and Adjustable Price Life of the Well Contracts," "Limited Term Purchase Agreements," "Three Year Fixed Term Agreements" and "Adjustable Purchase Price Contracts." The methodology of pricing natural gas changed in the early 1990s. Prior to that time, there were no recognized market indices of prices. As indices developed, appellee began to purchase gas under "Three Year Contracts" with the price set at a percentage of one of the established indices.
 {¶ 8} The price paid for the gas at issue in the case sub judice has remained unchanged since 1986. In 1994, appellee entered into its last "Life of the Well" contracts with a purchase price of $2/MCF. No "new vintage price" has been established since 1992. The "new vintage price" decreased from 1986 to 1994 for new gas purchased. As long as appellee established "new vintage prices," there could be no dispute as to the amount paid for the gas produced under these contracts. Appellee is presumptively compelled by market forces to pay a reasonable price for new production gas. Appellant was not entitled to more money for its gas until a "new vintage price" exceeded $2.65/MCF. In other words, appellant had no argument and could have no dispute until after 1994 when the pricing practice of appellee changed and appellee stopped entering into "Life of the Well" contracts and setting the related "vintage price."
 {¶ 9} Pursuant to the language of the 1986 contract amendments, appellant expected that the gas supply may once again be less than the demand and that the price of gas would again increase. At that time, market forces would compel appellee to establish a "new vintage price" in excess of the $2.65/MCF and the price paid to appellant would increase.
 {¶ 10} Appellant commenced the instant action on December 20, 2000 and alleged that appellee, or its predecessors in interest, wrongfully set a "new vintage price" of "$2 for all time" and breached the contracts by not paying "the difference between $4.00 per Mcf, which should have been paid, and $2.65 per Mcf, which was paid, for all gas production beginning on June 1, 2000." Appellant asserted "claims" in breach of contract, breach of good faith/fair dealing, duress, unconscionability, illusory contract and breach of fiduciary duty. Appellant asked for, inter alia, (1) a declaratory judgment that the previous modifications to the contracts were null and void, and (2) damages representing the amounts due and owing under the original contracts.[4]
Appellee denied any liability on the various claims and asserted a range of affirmative defenses.
 {¶ 11} The matter came on for a two day bench trial in May of 2002. At trial, the court heard testimony from witnesses and received "dozens of exhibits into evidence."[5] On April 29, 2003, the court issued an opinion and found that the "market-driven repricing mechanism" in the amended contracts failed when appellee stopped (1) entering into "Life of the Well" contracts and (2) "establishing `new vintage price.'" The trial court acknowledged that the parties continued doing business with one another from 1994 to the date the lawsuit was filed and, during that time, appellant was paid $2.65/MCF for its gas. Appellant neither objected to these payments nor demanded an alternate price. Because of a huge increase in natural gas prices starting in 2000, appellants could have received an additional $172,902.15 had they been paid a monthly "103% of the DTI index." The court noted, however, that it could discern no "appropriate" method under the law or the evidence to establish future prices for the contracts. The court thus found that the contracts were "unenforceable and incapable of completion by the Court" and that appellant, "which failed to avail itself of the available remedy, is not entitled to damages." Judgment to that effect was entered June 30, 2003.
 {¶ 12} Two weeks later, appellant filed a motion for new trial. See Civ.R. 59(A). The motion appears to argue that the trial court erred by not fashioning some sort of remedy in this case. Subsequently, the trial court overruled the motion. This appeal followed.
 {¶ 13} Appellant argues in its assignment of error that the trial court erred both in failing to award it monetary damages and in overruling its motion for new trial. We reject this argument.
 {¶ 14} Initially, we note that the appellant has not provided us with the necessary means to review this case — i.e. it has not provided us with a transcript of the trial proceedings. The duty to provide a transcript for appellate review falls upon the appellant and when portions of the transcript necessary for resolution of assigned errors are omitted, a reviewing court has nothing to pass upon and must presume the validity of the lower court's proceedings. App.R. 9(B); Fetters v. Penn (Mar. 9, 1999), Scioto App. No. 98CA2581; Rhoads v. Rhoads (Aug. 24, 1998), Highland 97CA944; also see Columbus v. Hodge (1987),37 Ohio App.3d 68, 523 N.E.2d 843. Absent any showing of irregularity we must presume the correctness of the proceedings.Tupren v. O'Dell (Oct. 14, 1998), Washington App. No. 97CA2300. This is true because any error on the part of a trial court must affirmatively appear on the record or we will presume that the judgment and proceedings below were valid. State v. Prince
(1991), 71 Ohio App.3d 694, 698; 595 N.E.2d 376; State v. Frost
(1984), 14 Ohio App.3d 320, 322, 471 N.E.2d 171.
 {¶ 15} Appellant asserts in its reply brief that a transcript is unnecessary in the instant case because it does not dispute any of the factual findings made by the trial court. Appellant states that we "can accept as true all of the court's factual findings" and, thus "need not refer to a trial transcript in considering this appeal." We disagree with the appellant's view on this matter.
 {¶ 16} Even if we accept all the trial court's findings as true, a transcript is required for several reasons. First, this case involves some highly technical vernacular that appears to be peculiar to usage and course of dealing within the oil and gas industry. The trial court was apparently familiar with some of this language, presumably from explanatory testimony given by witnesses at the trial. We, however, are not. Second, this case involves provisions set out in a number of "Life of the Well Contracts." We do not have a transcript that describes whether the contracts were ever admitted into evidence. Additionally, the parties argue that a number of issues in their briefs that turn on evidence adduced at trial. For example, appellee argues appellant waived its rights to damages because it accepted payment for natural gas after filing its complaint. Appellant disputes that argument in its reply brief stating that it "explicitly reserved its rights" pursuant to R.C. 1303.13(A) by sending protest letters. Without a trial transcript, we do not know exactly what occurred between the parties. Most importantly, the gist of appellant's claim on appeal is that, after it had determined that the repricing mechanism had failed, the trial court should have determined a price for the gas appellee sold to it. The trial court, however, found that it could not make such a determination on the basis of the evidence before it. The court explained as follows:
 {¶ 17} "The Court finds it impossible to do so [establish a fair price] after looking at the wide variation between the lengths of time that "vintages" were established. There is no established or consistent relationship between the prices previously established and the market price for gas. There is insufficient specificity in the dealing between the parties and in the language of the documents that govern their relationship, to permit or specify a redetermination on any regular schedule."
 {¶ 18} In order for us to determine if the trial court erred in its reasoning, we would also need to review the evidence that the trial court reviewed. We do not have that evidence before us, however. Thus, we must presume that the court reached the correct conclusion.
 {¶ 19} For these reasons, we hereby overrule appellant's assignment of error and affirm the trial court's judgment.
Judgment affirmed.
[1] We take our factual summary from the trial court's April 29, 2003 opinion. Generally speaking, this court summarizes the evidence adduced at trial rather than relying on either the trial court or the parties to explain the facts in a case. In the case sub judice, however, appellant filed a "Notice to Clerk" that the transcript would not be ordered. In its reply brief, appellant states that it "does not dispute any of the factual findings made by the trial court" and, thus, we use that opinion to provide the factual background information herein.
[2] A "Life of the Well Contract" apparently provides for the purchase of natural gas from a well so long as the well produces in paying quantities.
[3] Appellant argued below that its agreement/acquiescence to the 1986 amendment in pricing provisions was improperly obtained. However, as the trial court aptly noted, the statute of limitations had run on any claim of that sort.
[4] On January 25, 2002, appellant filed an "amended prayer for relief" and, on May 2, 2002, filed an amended complaint with additional "claims" of "gross negligent misrepresentation," "bad faith breach of contract" and "special relationship."
[5] Insofar as the number of exhibits actually received into evidence, we have no idea but simply accept this representation in appellee's brief. We do not have the trial transcript that identifies and describes the exhibits introduced at trial. Without a transcript, we have no idea what evidence was admitted and what evidence was excluded.